Our next case of the afternoon is Burks v. Vivirito. For the appellant, Mr. Gregory, and for the appellant, Mr. Stocks, you may proceed. My name is William Gregory and I'm here on behalf of the plaintiff, Margaret Burks. As the court is aware, this is a personal injury action resulting from an auto accident that occurred in November of 2005. As the parties testified, my client was stuck in traffic behind several vehicles in front of her, at which point the defendant, Mr. Vivirito, rear-ended her vehicle. There are some different accounts as to regards to the damage to the vehicles, but my client, directly after the accident, reported to the back. She then followed up with her primary physician, Dr. Shepard, a few days later, had some MRIs performed, went through some therapy. After the therapy was ended, she testified that she continued to perform home exercises and continued to have some on-going... Who is Dover Products? I'm sorry? Who is Dover Products? The owner of the vehicle. They were initially added to it because we were not clear as to whether or not Mr. Vivirito was working or, you know, doing some type of employment on behalf of them at the time of the accident. It was later determined that that was not the case, and I believe there was no additional claim. I don't know, maybe they weren't formally dismissed from the Were you trial counsel? Yes. Your client testified that the truck hit her going at what rate of speed? The speed limit, around 30 miles an hour. And the defendant, Mr. Vivirito, disputed that? Right. His testimony was that the vehicle he was driving was going approximately five miles per hour. Is there any testimony about the condition of the vehicles after the accident? Yes, there is, Your Honor. All of the parties agreed that Mr. Vivirito's, the buffer slash fascia on the front of the Mustang that he was driving was knocked off, and that the passenger in my client's vehicle actually helped him to finish removing it. It was knocked off and hanging down, and that Jason Smith, the passenger in my client's vehicle, helped him unhook it so that he could take it off and the vehicle could be driven away. Jason Smith also testified that the front of the vehicle of the Mustang, what was dented in, my client and the passenger in her truck, she was driving a small Chevy S10, or I think it was a Dodge Dakota, a small pickup truck. They both testified that there was a dent in the back of the pickup truck that was basically the front of the Mustang had left an imprint in the back of the pickup truck, and that the bed of the pickup truck had been moved forward like half an inch. You know, they didn't measure it. Were there any photographs of the vehicles post-accident? No, there were not. It was, they had borrowed somebody's vehicle, and the individual whose vehicle was not in for some reason, there were never photographs taken of the vehicle. Your brief cites two cases on the standard of review. Yes. You cite no cases with respect to any of the other issues before the court. I'm sorry? Is there some reason not to cite any cases with respect to these problems? Well, I believe I did cite a few cases. I'd have to go back through the brief and look at it. If you did, then you're incorrect, because you only show two cases in your initial brief. Your opponent shows some cases, and in your reply brief, you say nothing about the cases cited by your opponent. Well, how about the Custison case? Well, I guess in regards to that, I was relying on essentially the facts of the case and what I perceive to be our standard as far as what we need to meet. For example, I know I cited some of the various jury instructions that were provided to the jury in regards to what the plaintiff was required to prove in order to establish her case in regards to a personal injury claim, in regards to the fact that she's required to prove that the defendant was negligent, that she's required to prove that she was injured, and that she's required to prove that those injuries were approximately caused by the accident. And I guess I was focusing more, because I guess I was looking at it more as a factual issue. Oh, was Custison a factual issue case? Off the top of my head, I'm not certain. I didn't, as I'm going through here, going through this today, I didn't reread Custison, so I'm sorry. Well, your opponent used it in his brief quite strongly, and you don't even mention it in your reply brief. That was just because I felt like the facts that he presented... Well, you didn't tell us that. In my reply brief, I mean, I went through the first several pages of pointing out the different facts. Well, where did you say that Custison does not apply? I mean, I didn't specifically say Custison does not apply. My argument was that the facts of the case establish Mrs. Burke's claim. I mean, if what she's required to prove is that the defendant was negligent, and that he did not do what a reasonably careful person would do, which the defendant admitted he was not paying attention while he was driving, which caused him to run into the back of a vehicle that was not moving, then the facts of... It's our position and our belief that the facts are clear on that issue. That, you know, if he's not paying attention, then he was clearly negligent. If our client is required to prove that she was injured as a result of this accident, if you look at the... If you look at her testimony in regards to her injuries, and you look at the medical room report clearly states that she's here a couple hours, and if you look at the time frames as far as when she presented to the emergency room, approximately two hours after the accident, and the doctor notes that she is diagnosed with a motor vehicle accident with acute lumbar sprain, and the doctor notes that she's experiencing low back pain that she's never experienced before, then the facts of the case would be that she clearly has any merit to your opponent's statement of facts that at the accident scene, your client did not report any injury. She was alert, conversant, and ambulating for two hours. There was no request for medical assistance, and reported no injury to the defense at the time. Is that correct? Some of it is correct. What's not correct? Well, the part of it that's correct... I mean, the fact that she... You tell me what's not correct. You've got the benefit of his brief. You tell me what's not right. What's not right is that she did report injury at the scene of the accident. Yes, she was ambulating, but she was ambulating in pain. She reported that to the passenger that was in her vehicle. The only conversation she had with the defendant was sort of a, are you all right? You know, can my passenger, you know, help you with the vehicle? There was no discussion among them about... But did she sustain any marks, cuts, bruises, or a break? No, she did not. Did she strike any part of her body, or anything, within the vehicle? Did she... You mean... She was not... No, she was not thrown into anything in the vehicle. When the vehicle hit her from behind, she was pushed forward in her seat, but she did not strike anything. She was basically stiff. She said she locked her arms and her legs and braced herself against the steering wheel and against the brake. She had the seat belt on, didn't she? Yes, she did. As I was stating before, the facts in regards to the negligence we believe are clear. The second prong of what she has to prove is that she was injured, which we believe is clear, because she went directly to the emergency room after the accident. She reported to the only person that she really spoke to at the scene of the accident that she was injured. The doctor... What did the people at the emergency room tell her to do? They told her... They gave her some pain medication, and they told her that she was taken off of work for two days, and they told her to follow up with her primary care physician in five days if it did not improve. They told her to go in five days? They didn't tell her to go the next day? No. I believe that the notes say... Recommendations on the emergency room records say, stretching exercises to the low back and see Dr. Susan Shepard if not well in five days or any time if worse. So they specifically told her five days or any other time if worse, and she actually saw Dr. Shepard on the 14th, which was four days later. And then did she go back to him? To Dr. Shepard? Yes, she went and saw Dr. Shepard a few days later. The Dr. Shepard ordered MRIs of the cervical spine, which were performed... Did she go back to Dr. Shepard? She actually ended up having, because of her medical insurance, she was required to switch doctors, so she went and saw Dr. Cantamnini in January. So she did follow up with the doctor afterwards, but because of a change in her medical insurance, at that point, she could no longer use her medical insurance to pay to see Dr. Shepard, so she actually followed up with Dr. Cantamnini in those notes. Where did carotherapy come in? That was when she switched, and that was the January visit with Dr. Cantamnini. She did therapy after that, starting in January, once the insurance changed. And where did Dr. Schnack come in? Dr. Schnack is a chiropractor that she followed up with two years after the accident, and she sought treatment for her low back at that point, starting in 2007. Because she completed the therapy at Carl Clinic, she initially went to the emergency room, she followed up with Dr. Shepard four days later, Dr. Shepard ordered an MRI, which was performed a few weeks later, and then her insurance changed, and so when her insurance changed, she went to Dr. Cantamnini, who ordered the physical therapy at Carl. Once she completed the physical therapy at Carl, her testimony was she was given home exercises to do, that she continued to do after she was released from physical therapy. She tried that for a little over a year, and when she finally got to the point where she decided that she wanted to try something different because it wasn't really resolving her problem, so then she went and saw Dr. Schnack, a chiropractor, to see if chiropractic care would help alleviate her condition. And then at that point, she began treating with Dr. Schnack, and Dr. Schnack's evidence deposition was submitted, which explains the treatment that she received. She went through three, four-week courses of chiropractic treatment in relation to the low back pain that she was experiencing. There was a slip and fall on ice towards the end of that treatment that created some other neck problems and things like that, and that was some unrelated treatment that she went through with Dr. Schnack, but Dr. Schnack also testified that she had ongoing, what she had recommended to Ms. Burks was a once-a-month adjustment with the chiropractor, essentially just to preserve her condition so that she wouldn't get any worse. Counsel, did you get in everything in front of the jury that you wanted to? I mean, was there evidence that was excluded that you thought? Not really, because, I mean, what we did is we had a stipulation in regards to, rather than you spending the money to do evidence depositions with the emergency room doctor, Dr. Shepard and Dr. Cantamini, we did a stipulation to submit the medical records. Sitting on a jury, one of the first things that occurs to me, pickup truck, Mustang, 30 to 35, maybe five, no pictures, not your fault, I don't know when the client came to you, it's not easy to preserve evidence. But I could easily see 12 jurors concluding that the accident was not nearly as violent as your client suggested, or the Mustang could never have driven away from the accident. And then second, there are unanswered questions about what caused your client's condition, based upon Dr. Shepard, for example, the things that she said in the treatments, and pre-existing condition, and a slip and fall between the event and the trial. So the jury is thinking, we don't know, plaintiff may have pumped up the violence of the collision, and then we don't even know if whatever did happen is a result of the collision, however severe it was. What is it that we say as a court of review, what do we tell those 12 jurors, and you and the judge, and the parties, what legal basis is there for us to reach over, to overrule the jury's decision and go another way? Well, in that regard, I guess I would say that the evidence, all of the parties agreed that there was damage to the vehicles. I mean, there's no dispute as to that. Yeah, there was a collision. Right, there was a collision, there was damage to the vehicles. There's a dramatic difference between speed limit, 30 miles an hour, on a busy street, and 5 miles an hour, hitting a stopped vehicle. I guess, if the collision, though, is sufficient enough to cause damage to both vehicles, I mean, obviously, my client is not made out of steel, or plastic, or whatever these vehicles are made out of. I mean, the medical reports in the emergency room, just a couple hours after the accident, are clear that she's coming to the emergency room, directly from the scene of the accident, reporting pain that she's never experienced before. And so, I mean, even considering that Dr. Schnack had issues related to treatment that she provided two years after the accident, if you go through all of Dr. Schnack's affidavit, the only statement that she makes in regards to the treatment directly after the accident is on, essentially, the last couple pages of her deposition, where I asked her a question, she had a notation in her records that the accident was the cause of Ms. Burke's back pain. And I asked her a question about that, because she had stated that the accident was the only cause of the patient's condition. And when I asked her, I said, you know, you referred to the only cause of the patient's condition as being the accident, and that's what you stated, yes. And she said, well, and I asked her, what condition are you referring to? And she said, I was referring to, what I was referring to was the fact that Maggie, Margaret Burke, stated she injured her back after the accident and had ongoing problems with it. And so, her only discussion in regards to the treatment directly after the accident in 2005 through, from November of 2005 through April of 2006, when she did the initial course of treatment, and she did the initial physical therapy right after the accident, Dr. Schnack's only testimony to that regard was that her records stated, and that she stated that the accident was the only cause of that pain. There's nothing else in the medical records that were submitted from the doctors in the emergency room, from Dr. Shepard, you know, from Dr. Cantemini, that referenced any other cause. So, you've got a situation where she goes directly from the scene of an accident where both vehicles were clearly damaged. She reports directly to the emergency room, is diagnosed with an acute lumbar strain, resulting from a motor vehicle accident, as documented in the emergency room doctor's report. So, even if you say, okay, Dr. Schnack didn't link it. So, I think that the jury was correct in saying, okay, I have some issues with saying that these ongoing problems have anything to do with this accident. That doesn't take away from the fact that all of the evidence is that she immediately reported to the emergency room with an acute lumbar strain resulting from the accident. You're skipping over the, no, you're not really, because you conceded about the damage. And I'm not suggesting to you that a court of review decides the case upon what we see on television. But every one of those jurors had the opportunity to be exposed to those consumer reports, things that show up on 60 Minutes, a 30 to 35 mile an hour collision with a Mustang against the rear of a pickup truck would have totaled the Mustang. Now, that's common knowledge among the populace. If the members of the jury, if any of them had been in automobile accidents and brought that kind of common experience to the table, isn't it possible that they just decided from the very beginning that the accident was de minimis? Based on the record. And I understand about that. I've suffered low back pain. I understand. Right, right. No, I mean, I understand what you're saying, but I also just think that... I'm not saying that's correct. Even if they go there, I mean, even if you would say, okay, we don't think it was 30. I mean, five miles an hour is the speed of someone walking. I mean, if you're going five miles an hour and you strike the back, I mean, if I'm walking along and I run into the back of a parked vehicle, you know, just walking, you know, that's not going to be sufficient damage to knock a bumper off the Mustang. I don't know what kind of car you drive, but that's $1,000 worth of damage. So... Five mile an hour collision. I mean, I guess, but it's just something where, I mean, there's no doubt that the collision occurred. Right. There's no doubt that she went to the emergency room immediately after the collision and reported to the doctor, and the doctor recorded instead, she's here for an acute lumbar strain resulting from a motor vehicle accident that just happened. And she's never had this pain before. That's exactly what she's reporting to us. She's never had this pain before. So I guess I'm looking at it and saying, minimally, the facts clearly establish that she went to the emergency room with, I mean, if nothing else, you pay the emergency room bill. You know, I mean... We'll hear from you on rebuttal. Your time's expired. Okay. Please, the court. Counsel. The jury returned a general verdict in a negligence action. Three of the elements of a negligence claim are fact-driven questions. Breach of duty, injury, injury proximally caused by the breach of duty. Our brief focuses on what we think is the strongest point defending this verdict, is that there was no injury as a result of this accident. The allegations of injury and the claim of injury all revolves around a core of what she subjectively claims to be true, and she being the plaintiff. So the plaintiff's credibility is at that core. It's at the core of any history reported to a doctor that a doctor relies upon for any opinions they may offer. And that is the singular issue in this case, where there is divergent testimony inferences to be drawn. The trier of fact was able to observe her in the course of trial, her demeanor, her method of testifying, inconsistent statements she made at various points in time, and concluded, we submit in a general verdict, we don't know the specific reasons, she simply was not credible. She was not credible. Any medical opinions fail based on the history she reported. Were you trial counsel? I was. So you're the magician who got this verdict? I respectfully submit that they were only out 20 minutes when they came back with their verdict. I submit they did not ignore any evidence, that there was ample opportunity for them to have concluded, from the get-go of this story, of a high-speed impact in congested traffic, where she claimed she was stopped for, I believe it was 30 seconds. The traffic was so heavy that she couldn't move through cycles of lights, dead stopped and says that our young driver pulls out of the school, going 30 miles per hour, and she was able to observe him for 30 seconds on his approach. And he just drove into the rear end. The violence of the collision and the inconsistencies in the event itself, from the very first inning of this debate, she was telling a story that just didn't fit. It didn't fit the fabric of the background and the context. Did your client testify? He did. And he said, no, it wasn't going that fast? He pulled out. He had just pulled out from a driveway, just not far from where impact occurred. He was going five miles per hour or less and was distracted. He doesn't get stopped in time. He described the scooping of his vehicle, which gets then into the physical evidence. It was? What is that? Pickup truck versus the Mustang at the high rate of speed, but also the relative plane of the vehicles. They want to describe a damage. And this was telling. The only two people that testified to damage to the truck used the interesting language of imprint on the tailgate of the truck. Imprint was a curious term, but they had the same description to the jury, that somehow this Mustang got elevated above the level of the rear bumper of the truck to make the imprint on the tailgate. Again, sitting there in the trial where a son says, I've never spoken to mom about the accident, and I thought it was a curious choice of the word imprint, trying to make the physical evidence fit of a lower profile vehicle somehow getting elevated to cause even the physical damage they were claiming happened. And it doesn't stand alone there. We ask ourselves, if we were 30 miles per hour and she stopped only two to five feet behind the vehicle immediately before her in traffic stopped, and you have no impact, that tells us that this accident did not occur anyway as she claimed, that this jury would have been free to wholly reject her description of the occurrence. And she's at the scene for, as she said, two hours following the occurrence, conversing with others, having no in visa of injury, no marks, cuts, bruises, or abrasions, an item of inquiry in the Maple case, sustaining a jury verdict there. Two hours, no request for emergency care or medical care. The only person who claimed she reported injury, again, was her son, Passenger, a bias that the jury could have concluded given that relationship, given the strange similarity of testimony. They may have rejected his testimony as well. What did your client say about Ms. Burt's claiming injury? His observations were she was uninjured. She made no claim of injury to him. She asked him whether he was okay, and he indicated he was okay. And that was the extent of the testimony along those lines, other than she testified that she did not request assistance at the scene when the police arrived investigating the accident. We move from accident scene to the emergency room. And the history to the emergency room physician in and of itself is inconsistent. At first, it's her neck, then her back. Not really my neck, it's my back. The physical examination has no objective findings. A subjective report of tenderness. X-rays for acute objective pathology were negative. Subsequently, MRIs were taken to ascertain whether there was any pathology or objective evidence of injury. And Dr. Schnack, the chiropractor, was questioned on this, and she testified that given the immediacy of the MRIs relative to the event, that the MRIs would have revealed pathology that preexisted the accident. Now, Schnack knew the neck or the cervical pathology preexisted because she had treated this lady back in the 90s. The low back, she said those were indicia of degenerative changes that would have preexisted. She specifically was asked that based on the preexisting pathology, might or could, the symptoms that she, the patient, reported be related to the preexisting pathology in the absence of trauma. And she said yes. Thus, evidence to support the verdict, even though as defense, I did not have to come forward with any evidence to disprove a subjective claim of injury, there is nonetheless an objective pathology that could explain the symptoms in the absence of traumatic event against sustaining the verdict. What did your client say about the nature of any injuries he suffered? He said he didn't suffer any? Did not suffer any. Did he testify he was wearing a seatbelt? That I do not recall. It would not surprise me if he wasn't, but I do not know the answer to that, Your Honor. So, we have, as in Gustafson, a de minimis impact, based on our version of contested facts. Didn't strike your body on anything. The mechanism of injury, an important inquiry. Because, as we argued to the jury, how did she hurt herself? How did she hurt her low back? She had no twisting, no rotation, no hyperflexion or extension. The same was true with her neck. Merely the fact of a force does not necessarily correlate in the ordinary experiences of life that you hurt your neck or you hurt your low back. We had no described mechanism of injury to explain this injury. We had no marks, cuts, bruises, abrasions. Seatbelt held tight, but didn't leave any marks. No loss of consciousness. Two hours at the scene without report or request for assistance. Pre-existing degenerative changes. A checklist of factors, each of which is present in the Maple v. Gustafson case. As similar in the Moran v. Erickson case, the other case we cite, which also goes to the proposition, just because a patient says they hurt, and that's all their evidence is. She said, I hurt, and a doctor relies upon that, does not establish that an injury occurred. The jury is still free to reject that subjective testimony if they likewise are rejecting the credibility of the plaintiff or the patient. That's the lesson of Moran, and that's the underlying lesson of 3.08, IPI 3.08, that was given to this jury. Why should the jury have disbelieved her? Incredible story of the occurrence. Impeached in terms of, was her neck injured in this accident? In discovery deposition, she said no. At trial, she says yes. At other points and times in discovery, she says her neck was hurt. In the emergency room, in her history, at first it's her neck, then it's her low back. The first doctor's visit after the emergency room, it's her neck, when initially it was her low back. When she gets to the new doctor after insurance in January, two months post-accident, it's her neck and no reference to her low back. She goes through physical therapy, claiming her low back's still causing her the problems. It's not present in the records that were admitted into evidence. She's cross-examined on it, and she then starts telling this jury, the doctors didn't record everything I told them. That there are other examples of prior inconsistent testimony in the course of her trial testimony. They observed her. They listened to the totality of evidence and said, we do not believe her, or we do not believe her sufficiently to accept that she's met her burden of proof on each and every element of the case. Do you recall whether the record shows that the pickup truck had head restraints? I believe, I don't know whether the record shows it, but I, and this is, when you look in a record, whether it was in a deposition or a trial, I believe it did have head restraints. She was a very short lady, and whether we're dealing with a circumstance of a hyperflexion over the top of the seat, there was no evidence of that at trial. I don't know that I had evidence that disproved that potential, but there was no evidence. Did she testify, or was it argued by counsel at trial as to, regarding a neck injury, what would have accounted for that from the nature of the accident itself? No, only inference you would draw from a rear-end collision, but there was nothing described, as I recall in the record, that gave a specific mechanism of injury for the neck. She didn't claim that she was twisted or it went over the top or her head went over the top or anything like that? No, I went through that series of questions in my cross-examination. Now, may there have been something inconsistent with my cross on direct? That may be, but I have a checklist I'm going down, and she established nothing that would support, in that cross-examination, a rotation, hyperflexion, or extension injury to her neck, just the mere fact of rear-end collision. Again, even Schnack was asked about the pathology in the neck, again, distinguishing between objective and degenerative injury versus subjective, and she says there was nothing she could find that would have exhibited a progression of what she knew to be the pre-existing degenerative changes in the neck. So, as we're going through, again, we have only subjective claim of injury and nothing objective that they can bring home with any evidence, their burden of proof, that there was an injury sustained in this occurrence such that the jury had to ignore some clear fact that would render this on the basis of the totality of evidence, this general verdict is sustained on a finding that she wasn't injured, or if she has some medical conditions, they were not proximately caused by this occurrence, or they were de minimis so as to elude compensation, as the Snover case that we cite, that the verdict would be supported along those lines as well. And for those reasons, the trial court had the opportunity to rule upon this, having observed the demeanor and the manner of testifying, concluded that she had a fair trial, no assignments of error, either in instructions or in the exclusion of evidence, no misconduct asserted on my part, that they had a fair trial. She got her theory of the case in a manner that she chose to present it. Well, that was Justice Connick's questions. Was there any evidentiary issues, anything kept out that they attempted to present? None has been assigned. The only issue that I recall was I was allowed to question her regarding a smoking history, but no error has been asserted on appeal regarding that. And in terms of the instructions, the court did not take away the fault issue, and they had a post-trial directive verdict motion on that, so there was enough evidence where the jury could conclude that Mr. Vivarito was acting reasonably. But I am, I think for obvious reasons, focusing more on the last two elements of the case. Thank you, counsel. Thank you. Mr. Grader? I guess in first response, I would just say that in regards to Mr. Stock's indication that her discussion at the emergency room was inconsistent, her mention of neck pain recorded by the emergency room doctor is that she has not had so much as back pain, but neck pain is her main source of previous discomfort. So she wasn't reporting neck pain necessarily as far as going back and forth as to where her injuries were, as I feel like Mr. Stocks was trying to indicate, but that she was telling the doctor, you know, I haven't really had back pain before. Neck pain was what I really had before, and there's no, she's not disputing she had a pre-existing condition related to her neck, but that the injury that she presented with was back pain, but she was letting the doctor know that she'd had problems with her neck before, and that she did have, the doctor did note that she did have a protective gait. So there was, you know, some objective evidence that the doctor was able to see in that regard. But again, in regards to your previous question about the Maple versus Gustafson, I think the way we were looking at this, though, is that there was no evidence presented to the jury, in my opinion, that the plaintiff was not injured as a result of this accident. You know, there was nothing. I mean, she went directly from the accident scene to the emergency room, reported to the emergency room. She didn't go directly. I'm sorry? She didn't go directly. She only had two hours. But she testified that they had to wait for like an hour and some for the police officers to get there and to clear up and to go through everything. So, I mean, as soon as everything was done and she was free to leave, she went directly to the emergency room. What's your theory as to what caused her neck pain, given the nature of the accident? Well, the way she described it was that she locked her hands. She grabbed the steering wheel and locked her elbows stiff like this. And she did the same thing with her feet against the brake, that she braced against the brake. And then she was thrown forward. And so when she was thrown forward, you know, she described it as she went like this, you know. And then her back was, I mean, she was pushed forward, but she was pushed forward into the brake. And her legs, since she had locked her knees, her legs didn't give way. And so all of the impact was basically just shoved back. I mean, she was pushed up into it. She didn't strike the front of it because she was like this. And so what she's describing is she's like, it's like she's getting slammed like that. And so her feet, you know, were slammed up against the brake and up against the front of the truck. And her arms were shoved up like that. Why would her feet be, what accounted for the force against the front of the truck? The force was pushing her backwards. No, because she said that the truck was pushed. It was the truck when the vehicle was pushed. But that would be pushing her backwards, wouldn't it? Well, I mean, she was pushed up like this, and then she went up and then back. No, the force of the collision would be hitting her. The force of the collision would be forcing her back into the seat. She was hit from behind, so she wouldn't have been pushed forward. Maybe I'm describing it backwards. The way she described it is she was pushed forward, and she braced herself to stop herself from being pushed forward into. Maybe that accounts for the difficulty that the jury had. If you hit from behind, you're going to be forced into the seat. Maybe on the rebound you'll come forward. Well, and maybe that's how she described it. But the fact is, I mean, and he talked about, you know, I mean, because in Dr. Snack's deposition, she indicated, you know, that low back and neck injuries are the most common injuries from rear-end auto accidents. She noted that her low back pain started in November of 2005 after the accident. She testified that the motor vehicle accident could have caused her low back pain in 2007. She testified that the motor vehicle accident could have aggravated her need for ongoing maintenance care in 2007 and 2008. She testified that the motor vehicle accidents can aggravate the degenerative conditions that she had in her back and in her neck. She also testified that the motor vehicle accident could have been sufficient trauma to have caused her injuries. And then again, as I pointed out before, her last few statements were that, you know, in her records, she put down that it was her opinion that the motor vehicle accident did cause the initial low back pain in 2005. So, I mean, I guess my question would be, I mean, what evidence did the jury have that she was not injured in this? I mean, she clearly testified, and the doctors both record and agree with the fact that she never had this low back pain prior to this accident. And then within two hours after the accident, she immediately goes to the emergency room and starts reporting that. And so, the manifest way that the evidence is clearly that this low back pain started immediately after this accident. She continued to treat for approximately six months after that, related to her complaints that started in the emergency room and at the accident scene right after this accident. Thank you, Counselor. We'll take this matter under advisement.